1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

MICHAEL GERALD DIKES,

12

Petitioner,

13

v.

14

KATHLEEN ALLISON et al.,

15

Respondents.

Case No. 20-cv-335-MMA (NLS)

**ORDER:**
**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS;**

**(2) DENYING PETITIONER'S REQUESTS FOR AN EVIDENTIARY HEARING, FOR AN ORDER TO SHOW CAUSE, FOR APPOINTMENT OF COUNSEL, AND OTHER RELIEF; AND**

**(3) DENYING A CERTIFICATE OF APPEALABILITY**

16
17
18
19
20
21
22

Petitioner Michael Gerald Dikes ("Petitioner") is a state prisoner proceeding *pro se*

23

and in forma pauperis with a petition for a writ of habeas corpus pursuant to 28 U.S.C.

24

§ 2254.  Doc. No. 1.  Petitioner challenges his San Diego County Superior Court

25

conviction in case number SCN333404 on two counts of sexual intercourse with a child

26

10 years or younger, five counts of oral copulation/sexual penetration with a child 10

27

years or younger, one count of aggravated sexual assault of a child, thirteen counts of

28

lewd act upon a child with additional special findings of substantial sexual conduct with a

child under 14 as to four counts and findings of more than one victim as to all thirteen counts, and one count of simple battery, for which he was sentenced to 305 years to life in prison. *See id.* at 1; *see also* Doc. Nos. 15-16, 15-17, Lodgment No. 1 ("Clerk's Tr.") at 1248–51, 1365–67.

Petitioner alleges in Claim One that trial counsel rendered ineffective assistance by (a) failing to recuse himself from representing Petitioner due to a breakdown in communication and resultant conflict of interest and (b) failing to adequately investigate and present a defense to the sexual assault charges including (1) failing to properly challenge the prosecution's expert witness and (2) failing to obtain and present medical expert testimony. Doc. No. 1 at 6, 14–26. In Claim Two, Petitioner asserts the trial court erred in allowing the fruits of an illegal search, namely 140,000 images, videos, and search engine results from Petitioner's laptop computer, to be introduced into evidence at trial. *Id.* at 7, 27–30. In Claim Three, Petitioner alleges appellate counsel rendered ineffective assistance in failing to raise the allegations presented in Claims One and Two on appeal. *Id.* at 8. In addition to requesting relief from his conviction and sentence, Petitioner requests an evidentiary hearing, an order to show cause why the Petition should not be granted, appointment of counsel, suppression of evidence from the search, dismissal of all charges and restitution fines, and declaration of a conflict of interest with the San Diego Public Defender. *Id.* at 31.

Respondent has filed an Answer and lodged the trial record. Doc. Nos. 14, 15. Respondent maintains habeas relief is unavailable because all three claims are without merit and additionally asserts (1) Petitioner fails to show the state court's decision rejecting Claims One and Three was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts and (2) Claim Two is not cognizable on federal habeas review pursuant to *Stone v. Powell*, 428 U.S. 465 (1976). Doc. No. 14 at 2–3. While given an opportunity and several extensions of time to do so, Petitioner has not filed a Traverse. *See* Doc. Nos. 9, 19, 21, 23, 25, 27.

# I. FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming the judgment in *People v. Dikes*, D070972 (Cal. Ct. App. Mar. 29, 2018).  *See* Doc. No. 15-53, Lodgment No. 5.  The state court factual findings are presumptively reasonable and entitled to deference in these proceedings.  *See Sumner v. Mata*, 449 U.S. 539, 545–47 (1981).

> Dikes molested his two stepdaughters numerous times, beginning in the fall of 2009 and continuing until approximately June 14, 2014, when the victims' mother (Mother) caught Dikes in bed with one of the girls and called the police.  Although the jury convicted Dikes on multiple counts related to the abuse, we restrict our discussion herein to the facts relevant to the issues presented on appeal.

> *June 14 Incident*

> On or about June 14, 2014, Mother left the children home with Dikes while she went to the store.  While Mother was out, Dikes touched the breasts of the older victim both over and under her clothes.  Dikes went into the girl's room at least two different times and touched her breasts each time.  Later that evening, after Mother had gone to bed, Dikes entered the victims' room, laid down in the older girl's bed, touched her breasts again and bit at them with his mouth.  He also touched her vagina over her clothes.  Dikes attempted to move his hand under the girl's clothes but she moved it away.  While doing so, she bumped a tablet that was sitting nearby, causing the screen to light up.  Dikes left the room when the tablet lit up, but came back about 10 minutes later and continued to touch and bite at the child's breasts.

> Mother woke up around midnight and realized that Dikes was not in their bed.  She sent Dikes a text message asking where he was but he did not answer, so she went to look for him.  She noticed that her daughters' bedroom door was open and, as she looked inside, she saw Dikes laying in her older daughter's bed, partially under the covers.  She opened the door, turned on a light, and shouted "what in the hell are you doing?".  Dikes stated that he was "just giving the kids a hug goodnight" and got up.

> Mother asked her older daughter if Dikes had ever touched her inappropriately.  The daughter started crying and nodded her head, indicating that he had.  Mother told Dikes to leave and called the police.  The victim told

the responding officer that Dikes had put his mouth on her breasts.  Later that day, she told a forensic interviewer that Dikes tried to pull her shirt down to feel her breasts and put his mouth on her breasts three or four times that day, and that he came into her room several more times at night.  Mother's younger daughter also disclosed that Dikes had touched her inappropriately.

Dikes was arrested and charged with 23 counts of various forms of sexual misconduct with minors.

*Trial*

Both victims testified at trial.  The older girl stated that Dikes touched her breast at least twice during the day and touched and bit her breasts twice during the night on June 14, 2014.  When asked if Dikes touched her anywhere else that evening, she stated "I think like around my vagina area" and that "I think he tried to go under (my clothes) a little bit, but I, like, moved his hand." Later in her testimony, she had difficulty remembering the specifics of the abuse that day, but recalled that she had testified at the preliminary hearing that Dikes had touched her vagina.

Dikes testified that he never touched either child inappropriately.  He said that Mother would frequently refer to accusations that he molested another child when they were fighting and had threatened to accuse him of touching her older daughter.  He alleged that this happened regularly and stated he was sure both children had overheard Mother make such statements. The prosecution confronted Dikes with a photograph of his hand, including his tattoos, on one of the victim's breasts and evidence that he conducted internet searches related to sexual acts with minors.  Dikes denied that the hand or the searches were his.

Dikes' friend also testified that he overheard Mother accusing Dikes of molesting one of the children during a fight.

*Prior Uncharged Offenses*

In addition to the testimony of the two victims in this case, the prosecution also presented several other witnesses who alleged Dikes had previously committed uncharged sexual offenses against them.  Of relevance to the present appeal, A.P. testified that she met Dikes in Alabama when he began dating her mother, and that Dikes sexually abused her on a regular basis from the ages of 13 to 16 years old, including acts of oral copulation and

intercourse.  Dikes admitted that he had a sexual relationship with A.P. but testified that it was consensual and started after A.P. turned 16–the legal age of consent in Alabama.

*Expert Testimony*

Expert witnesses for both the prosecution and the defense testified regarding the typical nature of disclosures of sexual abuse by children.

Dr. Anthony Urquiza, a licensed psychologist and professor of pediatrics specializing in child abuse, discussed child sexual abuse accommodation syndrome (CSAAS), which he described as a tool to educate therapists about the common contexts in which sexual abuse occurs and the associated misperceptions about how a child might react.  Dr. Urquiza explained that children who are abused often have trouble revealing the abuse and, in accordance with CSAAS, they will instead find ways to accommodate the abuse.  In many cases, they do so by disassociating themselves from the abuse and, thus, they may appear distant and unemotional when they do finally disclose.  He did not discuss the facts of the present case, and did not offer any opinion as whether the conduct or disclosures of either of the victims was typical.  The court instructed the jury that Dr. Urquiza's testimony about CSAAS was not evidence of abuse, but could be considered in evaluating the credibility of the victims, and whether their conduct in disclosing the abuse was consistent with that of a typical abused child.

Dr. Ellen Stein, a forensic and clinical psychologist, testified for the defense.  She conceded CSAAS has been adopted by licensed clinical social workers as a way of understanding why a victim might disclose in a delayed manner, but asserted that it is widely criticized by forensic experts with a greater appreciation of the conventions of scientific research.  Dr. Stein further explained that CSAAS has not been validated by a peer-reviewed scientific study or endorsed by the American Psychological Association or the American Psychiatric Association, and that the doctor who originally developed it has since cautioned against using it in a forensic, or courtroom, setting.

Dr. Stein also testified regarding the theory of contamination, whereby a witness may be influenced by exposure to extraneous information, such as a story read on the internet or a family member discussing the facts of the case.  She explained that a child may be motivated to give or maintain a false story if the child believes he or she may have something to gain from doing

so, such as the approval of a parent.  However, when counsel tried to ask her if she thought the alleged victims in this case may have had something to gain by making false claims, the court sustained prosecutor's speculation objection.  At a sidebar, out of the presence of the jury, the court explained that it would not allow Dr. Stein to testify regarding the credibility of the witnesses, as that was a question for the jury and not an appropriate basis for expert testimony.

Defense counsel then asked Dr. Stein if overhearing mother accuse Dikes of improper sexual acts with another child may have influenced the victims in this case.  The court again sustained the prosecutor's objection, and explained defense counsel could ask about suggestibility or contamination in general but that it was not appropriate for the witness to give a specific opinion based on the facts of the case at hand or an opinion as to whether a given witness was telling the truth.  The court allowed defense counsel to proceed with general questions and hypotheticals about disclosure and contamination.

*Jury Instructions*

Prior to deliberations, the court instructed the jury on evidence of uncharged sex offenses using the standard instructions in CALCRIM No. 1191.  It stated the jury could consider the testimony regarding such prior uncharged offenses "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses," and that they were to disregard the evidence if the People had not done so.  Further, the court explained that this evidence could be considered as evidence that the defendant was predisposed or inclined to commit additional sexual offenses, but that it was not sufficient on its own to prove that the defendant was guilty of any of the charged offenses.  In that regard, the court specifically instructed the jury that "(t)he People must still prove each charge and allegation beyond a reasonable doubt."

The court then instructed the jury as to the elements of the various uncharged offenses under California law, including statutory rape in violation of section 261.5, subdivision (a).  The court stated the prosecution had presented evidence that Dikes had unlawful sexual intercourse with A.P. when she was a minor and more than three years younger than him.  To prove Dikes committed the uncharged offense of statutory rape, the People would need to prove that he had sexual intercourse with A.P., and that Dikes and A.P. were not married and A.P. was under the age of 18 and more than three years younger than him at the time.  Defense counsel continuously objected to this

instruction and argued the court should instruct on Alabama law, and not California law, in relation to A.P. because the alleged acts occurred in Alabama.

At defense counsel's request, the court also instructed the jury that the legal age of consent in Alabama was 16. However, the court also instructed, "(i)f the jury finds lawful sex occurred between (A.P.) and () Dikes in the state of Alabama when (A.P.) was 16 or 17 years old, you may still consider that evidence within the meaning of instruction 1191 (Evidence of Uncharged Sex Offense) and instruction 1071 (Unlawful Intercourse: Minor More than Three Years Younger PC 261.5(a))."

Doc. No. 15-53 at 3–8.

## II. PROCEDURAL HISTORY

The jury found Petitioner guilty of two counts of sexual intercourse with a child under the age of 10 in violation of Cal. Penal Code § 288.7(a) (counts 1 and 2), five counts of oral copulation/sexual penetration with a child 10 years or younger in violation of Cal. Penal Code § 288.7(b) (counts 3–6 and 20); one count of aggravated sexual assault of a child in violation of Cal. Penal Code § 269(a) (count 7); thirteen counts of a lewd act upon a child in violation of Cal. Penal Code § 288(a) (counts 8–16, 18–19, and 21–22) with additional findings of substantial sexual conduct with a child under 14 and of more than one victim pursuant to Cal. Penal Code §§ 1203.66(a)(8) (counts 8–11) and 667.61(b)(c)(e) (counts 8–16, 18–19, and 21–22), respectively; and one count of simple battery in violation of Cal. Penal Code § 242 (count 23). Clerk's Tr. 1248–51, 1362–66. The court sentenced Petitioner to a total prison term of 305 years to life. Clerk's Tr. 1365–66.

On direct appeal, Petitioner raised numerous claims of error not presented in the instant Petition, including alleging (1) insufficient evidence on counts 16, 18, and 19; (2) trial court error in restricting the scope of defense expert testimony; (3) trial court error in jury instructions; (4) ineffective assistance of trial counsel concerning the jury instructional error; (5) cumulative error; (6) trial court error regarding custody credits; and (7) error in the abstract of judgment requiring modification. Doc. No. 15-51,

Lodgment No. 3.  In a March 29, 2018, opinion, the California Court of Appeal ordered a correction to the abstract of judgment to address the discrepancy between the oral pronouncement of judgment and the abstract, and affirmed the judgment as modified. Doc. No. 15-53.  On April 16, 2018, Petitioner filed a petition for review in the California Supreme Court raising several of the claims from direct appeal, and on July 11, 2018, the state supreme court summarily denied the petition for review.  Doc. Nos. 15-54, 15-55, Lodgment Nos. 6, 7.

On July 2, 2019, Petitioner filed a state habeas petition in the San Diego County Superior Court in which he raised Claims One and Two presented here and claimed ineffective assistance of appellate counsel as the reason for the delay in presenting those claims.  Doc. No. 15-56, Lodgment No. 8.  On July 31, 2019, the superior court denied the petition in a reasoned decision.  Doc. No. 15-57, Lodgment No. 9.  On August 19, 2019, Petitioner re-raised the same two claims in a state habeas petition filed in the California Court of Appeal.  Doc. No. 15-58, Lodgment No. 10.  On September 3, 2019, the California Court of Appeal issued a reasoned denial of that state habeas petition. Doc. No. 15-59, Lodgment No. 11.  On September 12, 2019, Petitioner presented all three claims now presented in the instant federal Petition in a habeas petition filed in the California Supreme Court.  Doc. No. 15-60, Lodgment No. 12.  On January 22, 2020, the California Supreme Court summarily denied the petition.  Doc. No. 15-61, Lodgment No. 13.

On February 17, 2020, Petitioner constructively filed a Petition for a Writ of Habeas Corpus in this Court.  Doc. No. 1 at 11, 13.  On July 23, 2021, Respondent filed an Answer and lodged the state court record.  Doc. Nos. 14-15.  Petitioner did not file a Traverse despite being provided the opportunity and several extensions of time to do so. Doc. Nos. 9, 19, 21, 23, 25, 27.

### III. PETITIONER'S CLAIMS

(1) Trial counsel rendered ineffective assistance by (a) failing to recuse himself from representing Petitioner due to a breakdown in communication and resultant conflict

of interest and (b) failing to adequately investigate and present a defense to the sexual assault charges including (i) failing to properly challenge the prosecution's expert witness and (ii) failing to obtain and present medical expert testimony.  Doc. No. 1 at 6, 14–26.

(2) Trial court error in allowing the fruits of an illegal search, namely 140,000 images, videos, and search engine results from Petitioner's laptop computer, to be introduced into evidence at trial.  *Id.* at 7, 27–30.

(3) Appellate counsel rendered ineffective assistance in failing to raise the allegations presented in Claims One and Two on appeal.  *Id.* at 8.

## IV. STANDARD OF REVIEW

A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless the state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004).  With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of

rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)). However, "[p]risoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## V. DISCUSSION

Respondent maintains habeas relief is unavailable because all three claims are without merit and because (1) Petitioner fails to show the state court's decision rejecting Claims One and Three was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts and (2) Claim Two is not cognizable on federal habeas review pursuant to *Stone*, 428 U.S. 465. Doc. No. 14 at 2-3. Again, Petitioner has not filed a Traverse.

### A. Claim One

Petitioner asserts trial counsel rendered ineffective assistance by (a) failing to recuse himself from representing Petitioner due to a breakdown in communication and resultant conflict of interest and (b) failing to adequately investigate and present a defense to the sexual assault charges including (i) failing to properly challenge the

prosecution's expert witness and (ii) failing to obtain and present medical expert testimony.  Doc. No. 1 at 6, 14–26.

Petitioner raised Claim One in a petition for review in the California Supreme Court and the state court's denial was without explanation.  *See* Doc. Nos. 15-60, 15-61. The United States Supreme Court has repeatedly stated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").  As such, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court.  *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them no effect-which simply 'looks through' them to the last reasoned decision-most nearly reflects the role they are ordinarily intended to play." (footnote omitted)).  The California Court of Appeal reasoned and held as follows:

> In his writ petition, Dikes now contends his trial counsel was ineffective.  To establish ineffective assistance of counsel, Dikes must demonstrate deficient performance and prejudice under an objective standard of reasonable probability of an adverse effect on the outcome.  (*People v. Waidla* (2000) 22 Cal.4th 690, 718.)
>
> Dikes first contends his counsel was ineffective for failing to "recuse" himself despite a breakdown in his relationship with Dikes.  Dikes states he raised these issues at "Marden's Hearings," presumably in reference to hearings conducted pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Dikes, however, does not provide this court with a transcript of these hearings.  Even if we disregard Dikes' failure to raise this issue on direct appeal, his conclusory statements do not establish any substantial impairment of his right to counsel warranting habeas corpus relief.  (See, e.g., *People v. Vera* (2004) 122 Cal.App.4th 970, 979-980.)
>
> Dikes next contends that his counsel failed to conduct an adequate pre-trial investigation to obtain a defense expert that could undermine the testimony of the prosecution's expert witness.  To support this contention,

Dikes provides this court with an article from a medical journal.  Dikes contends this article completely undermines the prosecution's expert testimony at trial opining that the absence of internal physical trauma to Dikes's victims did not establish his innocence.  In the context of a claim of ineffective assistance of counsel challenging the failure to investigate, a petitioner "must establish the nature and relevance of the evidence that counsel failed to present or discover." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)  Here, Dikes offers no declaration from a medical expert and does not attempt to establish his own ability to offer expert testimony regarding the physical trauma caused by sexual molestation.  His speculative assertions about the potential testimony of a hypothetical defense medical expert are insufficient to state a prima facie case for relief.

Doc. No. 15-59 at 1–2.

"[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88.  In addition, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.  To demonstrate prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel previously adjudicated on the merits by a state court:

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

The Court will first address Petitioner's contention trial counsel rendered ineffective assistance in failing to recuse himself from representing Petitioner due to a breakdown in communication and a resultant conflict of interest. "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). "[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349-50 (citing *Holloway v. Arkansas*, 435 U.S. 475, 487–91 (1978)).

Petitioner offers two exhibits in support of his allegations. The first, Exhibit A, appears to be a copy of trial counsel's time record that contains an entry dated October 14, 2015, several months prior to trial, in which counsel indicated he "wanted to trade cases" because he thought Petitioner "was trying to bait [him] into losing his cool and getting near enough to him to do something physical." Doc. No. 1 at 35. Counsel noted Petitioner had in the past threatened him and said he was investigating him and "[h]e is not being forthcoming with me about his case to the point that it is hurting his own case." *Id.* Counsel stated he had never asked for a case trade before now but had done so for

others and now requested the same; a meeting between Petitioner and his supervisor was mentioned as another possibility. The second, Exhibit B, appears to be a memo entry entitled "Dikes Restraint," made during trial which requested Petitioner "be restrained and seated at least an arm's length away from me" to focus on Petitioner's defense without the distraction of potential disruptive behavior, given Petitioner's recent threat of violence against him.[1] *Id.* at 37. The memo also includes citations to professional conduct standards and ethics rules concerning revealing confidential information about a counsel's representation of a client and discussing the need to withdraw unless the client provides informed consent to continue the representation. *Id.* at 38. The memo also reflects counsel's organizational policy as stating: "It is the policy of the Public Defender that, if a disclosure (of threat) is made, a Conflict of Interest will be declared against the client about whom the disclosure is made." *Id.* at 37–38. Petitioner contends that despite this policy in favor of declaring a conflict of interest and recusal, "Public Defender nor his office made this mandatory Conflict of Interest" and asserts the failure to do so violated Petitioner's constitutional rights. *Id.* at 17.

While Petitioner argues the exhibits "shows us what petitioner has been arguing about at Marden's [sic] Hearings held in the past," *id.* at 16, Petitioner has not provided the Court with transcripts from any of his *Marsden* hearings.[2] Instead, the Court is left with Petitioner's conclusory allegations that the dispute with counsel deprived him of adequate representation, supported only by the two exhibits and the available trial record.

---

[1] While the memo entry is dated June 16, 2016, *see id.* at 37, it appears that date may be a mistake, given the memo references a discussion counsel and Petitioner had on Friday, May 13 and counsel raised the restraint/seating matter with the trial court on the morning of Monday, May 16, 2016. *See* Doc. No. 15-36, Lodgment No. 2 ("Reporter's Tr.") at 1197.

[2] As the state court presumed, the Court similarly presumes Petitioner's reference to "Marden's Hearings" refers to hearings conducted pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970), which provides a defendant contesting the adequacy of counsel's performance an opportunity to articulate reasons for the challenge potentially outside the observative abilities of the trial court. As this Court notes, the state court similarly noted the absence of any *Marsden* hearing transcripts. *See* Doc. No. 15-59 at 1.

The trial record reflects that on May 16, 2016, outside of the presence of the jury, defense counsel asked that Petitioner be restrained and seated away from him, as follows:

> I'm going to request that Mr. Dikes be restrained and seated at least an arm's length away from me.  The reason I'm making this request is so that I can focus on providing him a defense.  I need to maintain my attention on witnesses without being distracted by any possible disruptive behavior by Mr. Dikes which would interfere with my concentration to conduct his defense.
>
> The basis for my request, in continuing duty to Mr. Dikes, I'm only going to give that information which I think is needed for the Court to make a ruling on this particular subject.  But on Friday afternoon, May 13th, it was last Friday, Mr. Dikes and I talked.  And I believe he's emotional.  I believe he's upset.  But he did make a physical threat of violence to me, and that may be due to his frustration.  I don't think it rises to the level of a crime, but I do have concerns for my physical safety as I'm conducting his defense in this trial.
>
> And for that reason, because I would not be able to devote my full focus and attention on witnesses and things that are going on in the courtroom, I wouldn't be able to do that unless he was restrained.  As I said, I still believe I have a duty to Mr. Dikes; so I only want to disclose that much of it so that the Court can make its decision.  I believe that physical restraints can be imposed if the record shows that there is a threat of violence, and I believe I've satisfied that record.
>
> I do -- I think if he is restrained in such a way at arm's length away, I would still like him to take notes.  And if the Court does grant this particular ruling, I still would like to confer with him, but I think it's going to have to be via some note-passing.  So if the Court can make some accommodation as to that aspect of it, I would appreciate that.
>
> And I think the Court needs to admonish Mr. Dikes that any disruptive behavior by him is not grounds for a mistrial and may not even be grounds for reversal on appeal because an accused cannot benefit from -- on an appeal from their own misconduct before the jury.

Reporter's Tr. at 1197–98.  This request appears consistent with trial counsel's memo entry submitted by Petitioner as Exhibit B.  The trial court granted counsel's requests and

inquired as to the impact, if any, to counsel's ability and willingness to continue his representation of Petitioner, asking: "Despite the fact that he threatened your physical welfare and safety, are you willing to continue to represent him in this trial?" to which counsel replied: "Yes.  I'm not going to ask any different questions.  The topics of all of my questions are going to be the same.  The witnesses I plan on calling are going to be the same.  The only issue is I can't focus on witnesses when I'm focusing on something else as well."  Reporter's Tr. at 1203.

As to Petitioner's contention counsel or the Public Defender office was required to declare a conflict of interest and potentially recuse from representation, Petitioner does not indicate he either objected to or declined to consent to counsel's continued representation.  In the colloquy between the trial court and counsel concerning the request for restraints and alternative seating arrangements, Petitioner did not indicate he wished to terminate representation, nor did he voice an objection to counsel's continued representation.  When Petitioner expressed a wish to address the trial court against the advice of counsel and was given such opportunity, Petitioner instead simply inquired why the trial court took his counsel's statements as fact or credible and asked if the trial court was saying Petitioner was not credible.  Reporter's Tr. at 1206–07.  The trial court indicated it took statements of threats seriously, as "[i]t's not a question of taking it as fact," but instead "he's [trial counsel] raised a concern" which the trial court found believable and credible and "I'm not going to take the chance that he's just making this up."  *Id.*  The trial court addressed Petitioner and added: "You haven't said anything one way or the other, but frankly, if he tells me that's what occurred, I believe him.  I have seen him handle numerous cases.  He has never done anything to the detriment of his clients, ever.  So that's it."  Reporter's Tr. at 1207.  Immediately thereafter, the trial court asked Petitioner: "Anything else?" to which Petitioner replied: "No, sir."  *Id.*  Nor has Petitioner demonstrated that any alleged failure by trial counsel to adhere to his own organization's policy, on its own, somehow violated Petitioner's federal constitutional rights.

Ultimately, Petitioner fails to support his contention that any purported conflict with counsel or breakdown in communication rendered trial counsel's representation constitutionally inadequate.  In contrast, the record reflects trial counsel's defense of Petitioner was vigorous, including both in his cross-examination of prosecution witnesses as well as in the presentation of witnesses and arguments in defense of Petitioner.  For instance, A.P.,[3] who testified on direct she and Petitioner had sex when she was between the ages of 13 and 16 while he was dating her mother in Alabama, *see* Reporter's Tr. at 1247–62, acknowledged on cross-examination the activity went on for about a year, she was 16 or 17 when she told her mother in 2005 she could not continue the activity, the age of consent in Alabama was 16, and she never told her mother Petitioner threatened or forced her nor did she ever tell Petitioner she did not want to engage in the activity. Reporter's Tr. at 1280–84.  On cross-examination, A.P. also acknowledged she had separately alleged inappropriate sexual behavior by her own father that did not occur and was not observed by anyone.  Reporter's Tr. at 1289, 1296–97.

On cross-examination, Petitioner's wife and the victims' mother, Mother, acknowledged there was a "creepy neighbor" who could have been the reason for Petitioner's painting over her older daughter's bedroom windows.  Reporter's Tr. at 1410.  Mother also conceded her relationship with Petitioner was rocky and she had sent him mean texts; counsel asked her about violence she committed against Petitioner and prior threats she made to accuse him of inappropriate behavior towards her children. Reporter's Tr. at 1422–25.  Mother acknowledged she was a mandatory reporter of abuse through her work at a school, and when she previously asked her daughters if Petitioner

---

[3] In referring to the testimony of certain witnesses, the Court will employ the naming practice used by the state appellate court, which includes "A.P." to reference a testifying witness and alleged victim of uncharged offenses committed by Petitioner in Alabama and "Mother" to reference the victims' mother; the Court will similarly use "Older Daughter" and "Younger Daughter" to refer to the two victims in the case.  *See* Doc. No. 15-53 at 3–9.  The Court will employ similar labels to refer to two other testifying witnesses who allege they are victims of uncharged offenses committed by Petitioner, "A.W." and "E.W."

had behaved inappropriately with them, they denied it.  Reporter's Tr. at 1427–29.
Counsel also questioned Mother about the suggestive manner she ultimately asked her
older daughter about Petitioner's behavior, as she asked if Petitioner had touched her
daughter rather than simply inquiring what happened.  Reporter's Tr. at 1449–50.

Meanwhile, Older Daughter acknowledged on cross-examination she overheard
Mother accusing Petitioner of molesting a girl during the past and conceded Younger
Daughter might have been around to hear it as well.  Reporter's Tr. at 1546–48.  She
admitted telling an interviewer she had never seen Petitioner's penis before, indicating at
trial she saw only "glimpses" of it, and recalled stating she did not recall much of the
encounters with Petitioner that took place at some of the family's past residences.
Reporter's Tr. at 1554, 1556–58.  Older Daughter agreed Mother pointedly asked her if
Petitioner had touched her.  Reporter's Tr. at 1565.  Older Daughter also conceded her
trial testimony was the first time she ever mentioned to anyone that Petitioner had
attempted to put his penis in her rear end.  Reporter's Tr. 1567–68.

On cross-examination by defense counsel, Younger Daughter admitted overhearing
Mother argue with Petitioner and threaten divorce and heard Mother accuse Petitioner of
sticking his fingers into a girl in the past.  Reporter's Tr. at 1620–21.  Counsel also
brought out inconsistencies between her preliminary hearing and trial testimony as to
when she woke on the night Mother called the police on Petitioner.  Reporter's Tr. at
1622–23.  She also acknowledged hearing Mother say Petitioner's touching of Older
Daughter was inappropriate and she would call the police; Younger Daughter then spoke
up and said it happened to her too.  Reporter's Tr. at 1623–24.  She also admitted only
stating Petitioner had touched her with his fingers and that she later asked the interviewer
if there was anything she could say to affect his punishment.  Reporter's Tr. at 1630.
Counsel also questioned Younger Daughter about her claim Petitioner put his penis in her
butt and she clarified she never actually saw Petitioner's penis and was not certain it
touched or was exactly in her anus.  Reporter's Tr. at 1635–36, 1645–48.

A.W., who accused Petitioner of inappropriate activity when she was five and he was married to her mother, conceded when she was interviewed that the interviewer said Petitioner did inappropriate things to the daughters of his current wife which led her to believe it happened to others. Reporter's Tr. at 1657. A.W. also admitted she resented Petitioner for spanking her and his treatment of her mother and that she had no knowledge her allegations were the subject of any police report. Reporter's Tr. at 1658–62. The defense called Petitioner's mother Sarah Glisson, who testified E.W.[4] only told her Petitioner had "exposed hisself" to her, never said he touched her or grabbed himself, and admitted to Glisson she said what she did to try and break up her father's marriage to Petitioner's mother. Reporter's Tr. at 1742–46. The defense also called Petitioner's sister, who saw Mother strike Petitioner with a hammer on one occasion and heard her make threats about taking the children away from Petitioner. Reporter's Tr. at 1754. On cross-examination by defense counsel, the investigating detective admitted a photo showing a male hand in a photo with female breasts that did not reflect any visible tattoos on the male hand while Petitioner had tattoos on his own hand. Reporter's Tr. at 1827. The detective also acknowledged several text messages filled with expletives or calling Petitioner a liar had been sent to Petitioner by Mother just a few days prior to Mother's initial call to police raising the abuse allegations. Reporter's Tr. at 1834–36.

Dr. Urquiza, who testified for the prosecution about child sexual abuse accommodation syndrome, acknowledged on cross-examination there was no test to determine if someone was abused and that he did not have any personal knowledge or information about the case and had not made nor could make judgments as to the credibility of any testifying witness or render any opinion on the matter. Reporter's Tr. at 1894, 1929–31. Dr. Suresh, who the prosecution called to testify about the examinations

---

[4] E.W. testified Petitioner, who became her stepbrother when she was 8 or 9 and whose father was still married to Petitioner's mother, had put his hands on her breasts when she was about 10, and a few months later, put his hands on her vaginal region while grabbing himself. Reporter's Tr. at 1728–35.

of both Older Daughter and Younger Daughter following the accusations, agreed on cross-examination the documentation reflected Younger Daughter overheard Mother and Older Daughter discussing the allegations the evening of the report.  Reporter's Tr. at 1937, 1946, 1955.  Dr. Suresh admitted the examinations and follow ups were normal and there was no finding of lasting injury.  Reporter's Tr. at 1957–58.  Shown a photo of a hand holding a penis, the expert could not say with certainty it would cause vaginal or anal injury.  Reporter's Tr. at 1965–68.  Dr. Suresh admitted the medical findings did not tell them if molestation occurred.  Reporter's Tr. at 1969.

Petitioner testified in his own defense, explaining he spray painted over windows in several residences to protect his children from the eyes of strangers and his similar protective and old-fashioned tendencies were the reason he implemented a higher necked t-shirt rule for Older Daughter.  Reporter's Tr. at 1987–90.  Petitioner identified a photo of his penis he sent to his wife Mother and discussed its size.  Reporter's Tr. 1992–94.  Petitioner stated the internet searches found on the laptop were not his but were likely conducted by his nephew and denied knowing whose hands or breasts were in the photo introduced into evidence.  Reporter's Tr. at 1995–99.  Petitioner denied E.W.'s and A.W.'s allegations but admitted to having an affair with A.P. when she was around 17 and he was married to her mother.  Reporter's Tr. 2000–07.  Petitioner stated Mother had previously made numerous threats against him, in the hundreds, spoke loud enough for the children and neighbors to hear; had both previously assaulted him and twice tried to run him over with a car; and had threatened to make false accusations.  Reporter's Tr. at 2007–10, 2037–40.  Petitioner denied any sexual acts against either Older Daughter or Younger Daughter.  Reporter's Tr. at 2041–42, 2058.

Charles White, a friend who lived with the family and worked for a time with Petitioner, had no suspicions concerning molestation, heard arguments between Mother and Petitioner and heard Mother accuse Petitioner of touching Older Daughter several years prior to the instant crimes.  Reporter's Tr. at 1978–79.  White recalled Petitioner twice telling him about threats Mother made to Petitioner accusing him of touching or

molesting all three girls, including Older Daughter and Younger Daughter, and stating if he did not divorce her she would accuse him of child molestation.  Reporter's Tr. at 2171–72.

Counsel also called Dr. Ellen Stein, a forensic and clinical psychologist, to testify for the defense about child sexual abuse accommodation syndrome, as well as contamination and suggestibility.  Reporter's Tr. at 2174, 1278–79.  Dr. Stein reviewed transcripts of a 911 call, transcripts of forensic interviews with Older Daughter and Younger Daughter, and transcripts from the preliminary hearing.  Reporter's Tr. at 2179–80.  Dr. Stein discussed contamination and stated it was possible for contamination to occur if a child overheard an argument where one person accuses another of touching because it could give the child a different perspective and magnify or give foundation to a story.  Reporter's Tr. at 2193–94.  Dr. Stein also discussed the potential impact of repeated close-ended questions to children, stating sometimes the child will change an answer after repeated questions so the questions will end, and such an event could especially occur if the questioning took place in an unfamiliar environment.  Reporter's Tr. at 2195–96.  Moreover, if a child overheard an accusation about themselves, Dr. Stein testified such could also enhance suggestibility, particularly if the speaker had a good relationship with the child.  Reporter's Tr. at 2198–99.

In closing, counsel argued the jury must return a not guilty verdict due to reasonable doubt.  Reporter's Tr. at 2304–05.  Counsel first argued A.P. was not relevant to the charged crimes because she was 16 at the time of the sexual activity and above the age of consent in Alabama and her statements to both her mother and the investigator were consistent with an affair at 16 to 17 and lasting a year, despite her testimony at trial she was 13 and it went on for several years.  Reporter's Tr. at 2308–09.  Counsel argued A.P. was not credible given the changes in her account because of guilt and suggestion by investigators concerning the molestation charges against Petitioner and her false accusations against her own father.  Reporter's Tr. at 2309–10.  The defense contended A.W.'s testimony also should not be considered, noting she disclosed her accusations to a

therapist but it was unclear what kind of therapist or what questions were asked, plus there was no police report or corroboration in addition to suggestions by the investigator that Petitioner was guilty of molestation, as with A.P.  Reporter's Tr. at 2310–11. Defense counsel also pointed out there was trial testimony E.W. admitted to others she lied about the bulk of the accusations.  Reporter's Tr. at 2311–12.

Counsel also asked the jurors to disregard the evidence from the computer including the internet searches as it was unclear who made them, noting others had access to the laptop at the family home and the computer also had prior owners.  Reporter's Tr. at 2312–13.  Counsel argued against the consideration of the two pornographic photos of women in evidence as those photos were of adults, and separately of photos of Older Daughter by a bookcase and washing things as the angles by which the latter photos were taken looked as if someone shorter, such as a younger sibling, took the photos. Reporter's Tr. at 2313–14.  Defense counsel contended Dr. Urquiza's testimony did not go to the issue of guilt and that child sexual abuse accommodation syndrome is not supported by research or endorsed by major professional organizations.  Reporter's Tr. at 2314.  Counsel pointed out Dr. Suresh, who testified about the examinations performed on Older Daughter and Younger Daughter, could not tell if molestation occurred. Reporter's Tr. at 2314–15.  Counsel also contended a man with a large penis would cause injury, signs of injury, or discomfort at a minimum, while in this case there was no such evidence or any visible signs, specifically noting Older Daughter testified he went deep and moved around, and she was much younger at that time.  Reporter's Tr. at 2316. Counsel argued there was a lack of objective analysis or identification concerning the breast photo, it was unclear whether the photo was taken on the phone where it was found or downloaded from elsewhere, and in any event it was not Petitioner's hand in the photo given the lack of a tattoo.  Reporter's Tr. at 2316–17.  Counsel argued the DNA found on Older Daughter's chest was the saliva of Petitioner's young son, who Older Daughter took care of that day, and was not from Petitioner.  Reporter's Tr. at 2318–19.

Counsel emphasized Mother had threatened to accuse Petitioner of touching Older Daughter on multiple prior occasions by pointing out witness Charles White's recounting and noted Mother also had committed multiple assaults against Petitioner.  Reporter's Tr. at 2323.  While Mother denied accusing Petitioner of inappropriate acts against a young girl, counsel noted both daughters testified they overheard such accusations.  Reporter's Tr. at 2324.  Counsel also pointed out Petitioner's marriage to Mother was rocky preceding the accusations despite Mother's claim it was getting better, pointing to the text messages she sent Petitioner.  Reporter's Tr. at 2325.  Counsel contended both contamination and suggestibility by Mother influenced her daughters' accusations against Petitioner, and Younger Daughter was particularly influenced by overhearing Mother's questioning of Older Daughter.  Reporter's Tr. at 2326–32.  Counsel pointed out Younger Daughter asked her interviewer if there was anything she could say to influence Petitioner's punishment and Older Daughter had been subjected to forced (closed) choice questioning as opposed to open ended questions.  Reporter's Tr. at 2332–34.  Counsel asserted: "There's clear contamination and suggestibility, and that analysis leads to reasonable doubt."  Reporter's Tr. at 2339.

Again, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.  Here, Petitioner fails to articulate any way in which the purported conflict with counsel negatively impacted the quality of his representation, and the Court finds none.  Even an allegation that Petitioner failed to have a "meaningful relationship" with trial counsel is insufficient to demonstrate a violation of Petitioner's constitutional right to the effective assistance of counsel given the lack of any demonstrated impact on the adequacy of his representation. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel.").

Nor do Petitioner's remaining allegations of ineffective assistance of trial counsel fare any better than the above conflict of interest contention. Petitioner asserts trial counsel failed to adequately investigate and present a defense to the sexual assault charges including failing to properly challenge the prosecution's expert witness and failing to obtain and present medical expert testimony. Doc. No. 1 at 18–26. In support of his contentions, Petitioner primarily relies on a medical journal article Dr. Theodore N. Hariton which Petitioner originally submitted in support of his state habeas petition. *See* Doc. No. 15-56 at 40–44. Specifically, Petitioner asserts had counsel properly investigated, he would have found studies such as the one by Dr. Hariton concerning the effects of penetration in prepubescent girls, which reflects there would be evidence of penetration upon examination "months or <u>years</u> after the event." Doc. No. 1 at 18 (emphasis in original.) Petitioner argues the Hariton study and prospective testimony consistent with that study would have contradicted prosecution expert Dr. Suresh, who Petitioner contends testified "that there is no way to tell if someone had sex before." *Id.* at 19 (citing Reporter's Tr. at 1952). Petitioner asserts had trial counsel called Dr. Hariton to testify, "the jury would have heard the disputes" about evidence of penetration and contends "[c]ounsel had no tactical or strategic reason not to call a medical expert for rebuttal, any one of the Doctors in Dr. Hariton's study was readily available to testify, including Dr. Hariton himself." *Id.* at 20–21.

Upon review, the state court's rejection of this claim was reasonable. As the state court judiciously noted in rejecting the allegations of ineffective assistance in presenting a defense to the sexual assault charges, Petitioner offers little more than a medical journal article in support of his position and the theoretical prospect of procuring expert testimony consistent with that article. *See* Doc. No. 15-59 at 2 ("Here, Dikes offers no declaration from a medical expert and does not attempt to establish his own ability to offer expert testimony regarding the physical trauma caused by sexual molestation. His speculative assertions about the potential testimony of a hypothetical defense medical expert are insufficient to state a prima facie case for relief.").

Again, *Strickland* cautions a reviewing court against simply considering in retrospect actions counsel could have taken as opposed to evaluating the adequacy of counsel's performance, as "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  As such, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

As discussed above, counsel ably pursued a defense of reasonable doubt, challenging the prosecution's case through cross-examination, the presentation of expert evidence concerning contamination and suggestibility, and arguing to the jury both Older Daughter and Younger Daughter had been contaminated by Mother's prior accusations against Petitioner and improperly influenced by the types of questions both Mother and interviewers asked the daughters as well as Younger Daughter overhearing Older Daughter's conversations with Mother.  Given the defense contended there was ample reasonable doubt as to Petitioner's guilt and urged the jury's decision should be centered on whether the victims' accusations were the result of "clear contamination and suggestibility," *see e.g.* Reporter's Tr. at 2339, the Court cannot conclude counsel's performance in choosing to focus cross-examination on the influence of Mother and interviewers on the victims' accusations rather than the lack of evidence of physical penetration fell outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.").

Even assuming Petitioner could somehow demonstrate trial counsel acted deficiently in one or more of the respects alleged, his contention trial counsel was

constitutionally infirm in presenting a defense to the sexual assault charges also fails for lack of demonstrated prejudice. *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." (citing *Strickland*, 466 U.S. at 687)).  For one, Petitioner's failure to offer any expert declaration as to the substance of proposed testimony from a willing and available expert precludes a potential finding of prejudice. *See, e.g.*, *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").  Again, while Petitioner also speculatively asserts "any one of the Doctors in Dr. Hariton's study was readily available to testify, including Dr. Hariton himself," *see* Doc. No. 1 at 21, he fails to substantiate this contention.  The state appellate court reached a similar conclusion in this regard.  *See* Doc. No. 15-59 at 2 ("Here, Dikes offers no declaration from a medical expert and does not attempt to establish his own ability to offer expert testimony regarding the physical trauma caused by sexual molestation.  His speculative assertions about the potential testimony of a hypothetical defense medical expert are insufficient to state a prima facie case for relief.").

Moreover, Respondent correctly and reasonably observes expert testimony concerning the lack of physical evidence of vaginal penetration was unlikely to have made a difference in the outcome of Petitioner's case.  *See* Doc. No. 14-1 at 27 ("Finally, Dikes fails to appreciate that under California law, sexual penetration need only be slight and thus would not necessarily leave a lasting physical mark on a victim." (first citing Cal. Penal Code § 289(k)(1); and then citing *People v. Karsai*, 131 Cal. App. 3d 224, 232 (1982)) ("Penetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina.")).

California law indeed provides: "'Sexual penetration' is the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening

for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object." Cal. Penal Code § 289(k)(1). Additionally, the medical journal article upon which Petitioner primarily relies specifically focuses on physical evidence of vaginal penetration, as follows: "This viewpoint article is in response to literature discussing the concept that there might be no medical findings in prepubertal girls after traumatic penile vaginal penetration." Doc. No. 15-56 at 40. Moreover, the article also explicitly acknowledges the definitions of sexual assault and penetration used are medical ones rather than legal ones, stating: "In this discussion, *sexual assault* is defined as *actual non-consensual penetration of any orifice. This means actual penile penetration not just to, but partially or completely through, the hymenal ring*," and specifically noting as to penetration: "[t]he legal definition varies from state to state and is a legal rather than medical issue," and "[p]enile contact with the genitals is considered penetration by some states, but for this discussion that would be sexual abuse or sexual molestation, not sexual assault." *Id.* (emphasis in original).

The jury was instructed: "Sexual intercourse means any penetration, no matter how slight, of a vagina or genitalia by a penis. Ejaculation is not required," and "Sodomy is any penetration, no matter how slight, of the anus of one person by the penis of another person. Ejaculation is not required." Reporter's Tr. at 2255; *see also* Reporter's Tr. at 2257 (repeated instruction on definition of sexual intercourse); Reporter's Tr. at 2259 ("Penetration means penetration, no matter how slight, of the vagina or genitalia by the penis."); Reporter's Tr. at 2261 ("Sexual penetration means penetration, however slight, of the genital or anal opening of the other person, or causing the other person to penetrate, however slightly, the defendant's or someone else's genital or anal opening, or causing the other person to penetrate, however slightly, his or her own genital or anal opening by any foreign object, substance, instrument, device, or any unknown object for the purpose of sexual abuse, arousal, or gratification.").

1    A review of Older Daughter's testimony reflects she appeared to use the terms
2    "private(s)," "private areas," and "vagina" interchangeably. *See* Reporter's Tr. at 1475,
3    1480–81. Older Daughter testified Petitioner "tried to" insert or put his penis into her
4    vagina on numerous occasions. *See, e.g.*, Reporter's Tr. at 1481, 1482, 1486, 1492, 1495.
5    She also testified Petitioner touched her vagina with his mouth and hands. *See, e.g.*,
6    Reporter's Tr. at 1483, 1493, 1494. Older Daughter testified Petitioner's penis
7    "sometimes" went in her vagina. Reporter's Tr. at 1481. When asked on cross-
8    examination if Petitioner's whole penis went in, Older Daughter testified: "I think he has
9    -- yes, he has done that before, and I remember because it was really painful. And yes, he
10   has done that before, but he wasn't able to do it every time because I would -- I'd move
11   too much." Reporter's Tr. at 1554. However, Older Daughter also acknowledged she
12   never fully saw Petitioner's penis and never got a good look at it. Reporter's Tr. at 1555.
13   Younger Daughter, meanwhile, testified Petitioner touched her "private space" and
14   "vaginal area." Reporter's Tr. at 1577. Younger Daughter also stated with respect to her
15   allegation Petitioner tried to put his penis in her butt, testified: "I'm not exactly sure, but I
16   think he touched me with his penis." Reporter's Tr. at 1587.

17   Here, the proffered article, which discusses the expected physical evidence from
18   penile vaginal penetration partially or wholly through the hymen, appears of marginal
19   utility in the instant case. Even were Petitioner able to provide a declaration from a
20   willing and available expert to testify consistent with the topics discussed in the article,
21   given the victims' interchangeable use of the terms private areas and vagina and the
22   broad definition of penetration provided to the jury which encompassed even "slight"
23   penetration of the genital or anal opening, the Court finds no reasonable probability that
24   any such expert testimony would have resulted in a different verdict. *See Richter*, 562
25   U.S. at 112 ("The likelihood of a different result must be substantial, not just
26   conceivable.").

27   Ultimately, this prospective evidence is of no moment because Petitioner not only
28   fails to establish deficient performance, he also fails to demonstrate prejudice.

Petitioner's failure to substantiate his speculative claim as to what an expert might have testified to about the lack of physical evidence of penetration particularly when coupled with the state definition of sexual penetration, is insufficient to amount to any probability of a different verdict. *See Knowles*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel.") (citing *Strickland*, 466 U.S. at 687)).

Petitioner additionally fails to demonstrate the state court rejection of Claim One was contrary to or an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See id.* at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, habeas relief is unavailable as to Claim One.

**B.    Claim Two**

Petitioner asserts the trial court erred in allowing the fruits of an illegal search, namely 140,000 images, videos, and internet search engine results from Petitioner's laptop computer, into evidence at Petitioner's trial. Doc. No. 1 at 7, 27–30. Specifically, Petitioner contends the trial court originally supressed the evidence obtained in the illegal search of his laptop, but later allowed the prosecution to seek a warrant and conduct another search which yielded the same evidence, which the trial court allowed into evidence at trial over defense counsel's objection. *Id.* at 27. Respondent maintains this claim is not cognizable on federal habeas review pursuant to *Stone v. Powell,* 428 U.S. 465, because California provides an opportunity for litigation of these matters in state court and in any event, the claim also fails on the merits. Doc. No. 14 at 2–3.

Petitioner raised Claim Two in a petition for review in the California Supreme Court and the state court's denial was without explanation. *See* Doc. Nos. 15-60, 15-61. The Court will again "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court. *See Ylst*, 501 U.S. at 804. The state appellate court rejected this claim, reasoning as follows:

1
2
3
4
5
6
7

      Dikes next contends that the trial court erred in failing to suppress evidence, including indecent photographs Dikes took of his victims, that was obtained following an illegal search of his laptop.  Dikes could have raised this argument on direct appeal and his failure to do so precludes him from raising the claim in this habeas corpus proceeding.  (*In re Harris* (1993) 5 Cal.4th 813, 829.)  Moreover, "claims the police violated a petitioner's rights under the Fourth Amendment to the United States Constitution are not cognizable in a habeas corpus proceeding."  (*In re Reno* (2012) 55 Cal.4th 428, 506-507.)

8

Doc. No. 15-59 at 2.

9
10
11
12
13
14
15
16
17
18
19
20

      Clearly established federal law provides "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Powell*, 428 U.S. at 494 (footnotes omitted); *see also Hernandez v. City of Los Angeles*, 624 F.2d 935, 937 n.3 (9th Cir. 1980) ("[A] fourth amendment claim is not cognizable as a basis for federal habeas relief, where the state has provided an opportunity for full and fair litigation of the claim." (citing *Powell*, 428 U.S. 465)).  The passage of AEDPA has not abrogated or invalidated *Stone*.  *See Newman v. Wengler*, 790 F.3d 876, 881 (9th Cir. 2015) ("The *Stone v. Powell* doctrine survives the passage of AEDPA and therefore bars [Petitioner's] claim because he had a full and fair opportunity in state court to litigate his Fourth Amendment claims.").

21
22
23
24
25
26
27
28

      As such, the Court's federal habeas review is necessarily limited to determining whether Petitioner was afforded a full and fair opportunity by the state to litigate his Fourth Amendment suppression claim.  Respondent correctly observes California law provides procedures for litigation of such claims.  *See* Doc. No. 14-1 at 29 (citing Cal. Penal Code § 1538.5) (outlining grounds under which "[a] defendant may move for the return of property or to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure," including but not limited to an unreasonable warrantless search, facial insufficiency of a warrant and lack of probable cause for a warrant).

While the Court could simply end its inquiry here given California clearly provides an opportunity to litigate such claims, it is also worth noting the record additionally reflects Petitioner actually litigated this claim in the state courts.  Prior to trial, the defense twice filed motions pursuant to Cal. Penal Code § 1538.5, seeking to suppress evidence obtained from the laptop in question and the trial court held hearings on both motions.  In the first motion hearing, witnesses including Petitioner's wife and the investigating detective testified.  *See* Reporter's Tr. at 866, 930.  After hearing witnesses and considering the briefing, relevant authority, and arguments of the parties, the trial court ruled that while the seizure of the laptop was lawful pursuant to the wife's permission, the warrantless search conducted on the password protected areas of the computer accessible only to Petitioner was unlawful in the absence of authority for it.  Reporter's Tr. at 1011–13.  The trial court noted the police obtained warrants for Petitioner's phones with independent evidence and indicated nothing precluded the police obtaining a warrant for a search of the laptop based on independent facts, again noting the seizure and possession of the laptop was lawful.  Reporter's Tr. at 1015–17.  The defense later filed another section 1538.5 motion seeking to challenge the search warrant subsequently obtained for the laptop and search conducted pursuant to the warrant.  Reporter's Tr. at 1086–90.  The trial court reviewed the warrants, excised inappropriate information from the warrants which referred to the prior history, and found probable cause for issuance.  Reporter's Tr. at 1093–95.  The trial court ruled the warrant valid and denied the motion to suppress evidence obtained from the search.  Reporter's Tr. at 1098.  Petitioner also raised this issue in his state habeas petitions filed in the superior court, the state appellate court and state supreme court.  *See* Doc. Nos. 15-56, 15-58, 15-60.  Because it is clear "the state has provided an opportunity for full and fair litigation" of Petitioner's suppression claim, the Court is in accord with the state court's conclusion Claim Two is not cognizable on habeas review.  *See Hernandez*, 624 F.2d at 937 n.3 (citing *Powell*, 428 U.S. 465).  Habeas relief is not available on Claim Two.

## C.    Claim Three

Petitioner contends appellate counsel provided ineffective assistance in failing to raise Claims One and Two on appeal.  Doc. No. 1 at 8.  Respondent maintains Claim Three fails on the merits because Claims One and Two lack merit and asserts Petitioner also fails to show the state court rejection of the claim was contrary to clearly established federal law.  Doc. No. 14-1 at 29.

Petitioner presented this claim in a habeas petition filed in the California Supreme Court, which the state court summarily denied.  Doc. Nos. 15-60, 15-61.  Petitioner previously filed habeas petitions in the San Diego County Superior Court and California Court of Appeal, raising Claims One and Two and asserting ineffective assistance of appellate counsel as the reason for the delay in presenting those claims.  Doc. Nos. 15-56, 15-58.  The state appellate court issued a reasoned decision but did not address the instant contention.  Doc. No. 15-58.  As previously noted, the Court will "look through" the state supreme and appellate court summary denials of this claim to the reasoned opinion issued by the superior court concerning Claim Three.  *See Ylst*, 501 U.S. at 804.  The superior court addressed and rejected Petitioner's claim of ineffective assistance of appellate counsel in its adjudication of the state habeas petition filed in that court, reasoning in relevant part: "Petitioner also claims that his appellate attorney was ineffective.  'It is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit.  Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach.'"  *Jones v. Barnes* (1983) 463 U.S. 745, 749.  There is nothing to indicate that Petitioner's appellate attorney was ineffective, as the claims he makes in this petition are without merit."  Doc. No. 15-57 at 3.

Again, "a defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."  *Mirzayance*, 556 U.S. at 122 (citing *Strickland*, 466 U.S. at 687).  Here, Petitioner fails to show appellate counsel acted deficiently in failing to raise Claims One and Two on

appeal.  Because Petitioner has failed to show either claim is meritorious, the Court is not persuaded appellate counsel rendered prejudicially deficient performance in failing to raise either or both of these claims on appeal.  *See, e.g.*, *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."); *see also Mirzayance*, 556 U.S. at 122 (citing *Strickland*, 466 U.S. at 687).

In addition to clearly failing on the merits, Petitioner also fails to demonstrate the state court rejection of Claim Three was contrary to or an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See Richter*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.")  As such, Claim Three does not warrant habeas relief.

## VI. PETITIONER'S OTHER REQUESTS

In addition to requesting relief from his conviction and sentence, Petitioner requests an evidentiary hearing, an order to show cause why the Petition should not be granted, appointment of counsel, suppression of evidence obtained from the search of the laptop, dismissal of all charges and restitution fines and declaration of a conflict of interest with the San Diego Public Defender.  Doc. No. 1 at 31.  Each of these requests appear repeated from similar requests Petitioner previously made along with habeas petitions filed in state court.  *See* Doc. No. 15-56 at 30, Doc. No. 15-58 at 30, Doc. No. 15-60 at 31.

### A.     Request for Evidentiary Hearing

With respect to Petitioner's request for an evidentiary hearing, given Claims One and Three each fail on the merits, the state court reasonably rejected Claims One and Three, and Claim Two is not cognizable on federal habeas review, habeas relief is not available under section 2254 and an evidentiary hearing is therefore neither necessary nor warranted on any of the three claims in the Petition.  *See Sully v. Ayers*, 725 F.3d 1057,

1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."). Accordingly, the Court **DENIES** Petitioner's request for an evidentiary hearing.

**B.   Request for Appointment of Counsel**

District courts have statutory authority to appoint counsel in a federal habeas case when a petitioner is financially eligible and "the court determines that the interests of justice so require." 18 U.S.C. §3006A(a)(2)(b). However, because Petitioner's claims each clearly fail on the merits (and/or are not cognizable) and do not warrant habeas relief, and because it is obvious from the Court's review of the Petition and other pleadings Petitioner is able to clearly present his claims and arguments without counsel, the Court finds the interests of justice do not mandate appointment of counsel in the instant case. *See, e.g.*, *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986) ("Indigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations." (citations omitted)); *see also LaMere v. Risley*, 827 F.2d 622, 626 (9th Cir. 1987) (providing that the district court did not abuse discretion is declining to appoint counsel where "district court pleadings illustrate to us that [the petitioner] had a good understanding of the issues and the ability to present forcefully and coherently his contentions"). Accordingly, the Court **DENIES** Petitioner's request for the appointment of counsel.

**C.   Additional Requests**

The Court **DENIES** Petitioner's request for an order to show cause why the Petition should not be granted because the claims raised in the Petition either fail on the merits or are not cognizable on federal habeas review. Similarly, given the claims in the Petition do not merit habeas relief, and to the extent the Court can even consider Petitioner's request to dismiss all charges and restitution fines, the Court also **DENIES** this request.

Turning to Petitioner's request to suppress the evidence introduced at his trial proceedings, namely the "140,000 images, videos and Search Engine results," as the Court noted in the adjudication of Claim Two above, Petitioner's Fourth Amendment claim is not cognizable on federal habeas review. *See Powell*, 428 U.S. at 494 ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."); *see also Hernandez*, 624 F.2d at 937 n.3; *Newman*, 790 F.3d at 881. As such, the Court **DENIES** Petitioner's request to suppress the evidence introduced at his trial court proceedings because the claim itself is not cognizable on federal habeas review.

Finally, Petitioner requests the Court declare a conflict of interest with the San Diego Public Defender's office. As discussed above in Claim One, Petitioner's assertion of a conflict of interest fails for lack of merit and it is clear the adequacy of trial counsel's defense of Petitioner was not impacted by the alleged conflict. *See* Claim One, *supra*. Accordingly, this request is **DENIED**.

## VII. CERTIFICATE OF APPEALABILITY

A petitioner may not appeal "the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" except where "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254. "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court finds issuing a certificate of appealability is not appropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion that

Claims One and Three fail on the merits and Claim Two is not cognizable on habeas review, nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484.

## VIII. CONCLUSION

Based on the foregoing, the Court **DENIES** the Petition for a writ of habeas corpus, **DENIES** Petitioner's request for an evidentiary hearing, **DENIES** Petitioner's request for appointment of counsel, **DENIES** Petitioner's additional requests, and **DENIES** a certificate of appealability. The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED**.

Dated: May 17, 2022

HON. MICHAEL M. ANELLO
United States District Judge